## THE KAISER WILHELM II.

### (District Court, D. New Jersey. January 31, 1916.)

**1. ADMIRALTY ⬥1—JURISDICTION—SUIT BETWEEN FOREIGN LITIGANTS.**

A British libelant cannot maintain a suit in rem in an admiralty court of the United States against a German vessel to recover for repairs and supplies furnished in England, where the laws of both England and Germany are pleaded, and neither gives him a maritime lien, or right to proceed directly against the vessel, although in the absence of a showing of the foreign laws our own law would be applied.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 1–17; Dec. Dig. ⬥1.]

**2. MARITIME LIENS ⬥2—LAW GOVERNING—SUPPLIES FURNISHED TO FOREIGN VESSEL.**

Whether a lien, independent of express contract, exists for supplies or necessaries furnished to a foreign vessel, depends on the law of the place where the supplies or necessaries are furnished.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 2; Dec. Dig. ⬥2.]

**3. ADMIRALTY ⬥1—JURISDICTION—SUIT BASED ON FOREIGN STATUTE.**

Under St. 3 & 4 Vict. c. 65, § 6, which confers on the English Court of Admiralty authority to arrest or proceed in rem against a foreign ship for necessaries supplied, a court of admiralty of the United States may entertain a suit in rem to enforce a claim for necessaries supplied to a foreign ship in England, even though the English statute does not confer a maritime lien, but merely a right to sue the ship.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 1–17; Dec. Dig. ⬥1.]

**4. WAR ⬥16—SUIT BETWEEN SUBJECTS OF BELLIGERENT NATIONS.**

Since the commencement of war between England and Germany, and the promulgation by each government of laws or decrees prohibiting its subjects from making any payments to subjects of the other, and while such decrees remain in effect, a court of admiralty of the United States, in a case where its action is discretionary, will refuse to entertain jurisdiction of a suit between subjects of the two countries to enforce payment of a claim which arose in a foreign country.

[Ed. Note.—For other cases, see War, Cent. Dig. §§ 80–84; Dec. Dig. ⬥16.]

In Admiralty. Suit by Harland & Wolff, Limited, against the steamship Kaiser Wilhelm II; North German Lloyd, claimant. On exceptions to answer of claimant. Exceptions overruled, and libel dismissed without prejudice.

Burlingham, Montgomery & Beecher, of New York City, for libelant.

Joseph D. Bedle, of Jersey City, N. J., and Walter C. Noyes, of New York City, for claimant.

HAIGHT, District Judge. The questions presented for decision arise on exceptions to the answer of the claimant. The libelant is a British corporation; the vessel libeled is German, and is owned by the claimant, a corporation of the German Empire. The libel alleges, in substance, that in the months of June and July, 1914, the Kaiser Wilhelm II, the vessel against which the libel was filed, was at Southampton, England, in need of certain repairs and supplies, and that upon the order of the owner of the vessel, or a duly authorized agent, the libelant performed certain necessary work and furnished labor, materials, and supplies for the vessel at Southampton, which were of a certain value, and for which it has not been paid. The answer admits the necessity of the repairs and supplies, and the fact that the libelant, on the order of a person duly authorized by the owner, performed the work and furnished the labor, materials, and supplies, as well as the nonpayment of libelant's claim, but it denies that the amount claimed in the libel is correct. It then proceeds to set up certain separate and distinct defenses, the legal sufficiency of which the exceptions challenge. These will be stated later in connection with the exceptions. It appears that after the work was performed and supplies furnished the vessel sailed from England to this country and arrived at the docks of the claimant at Hoboken, in this district. While she was moored there the European war broke out. The libelant thereupon, in order to enforce its claim, caused a libel in rem to be filed in this court.

[1] The third exception, which can be first most conveniently considered, attacks that part of the answer which alleges that neither the law of Great Britain, where the work was performed, and the labor, materials, and supplies furnished, nor the German law (the law of the ship's flag), gives for the claim in suit a maritime lien or other right enforceable in the courts of this country directly against the vessel; that under the facts alleged a maritime lien is not given under the general maritime law, as recognized in this country; and that consequently the libelant is not entitled to proceed directly against the vessel in this jurisdiction. A stipulation has been filed which provides that the laws, decisions, and proclamations of Great Britain and Germany may be referred to by the court and counsel upon the consideration of the exceptions. I shall assume, therefore, that I am to determine, if necessary, what the law of either country is, without regard to the allegations of the answer. The law of a foreign country being a fact, I would at this time, were it not for this stipulation, be bound to accept the allegations of the answer in respect thereto.

Of course, the libelant cannot maintain a proceeding in rem unless it has a lien upon the vessel, or some right to proceed directly against it. If, as stated in Re Insurance Co. (D. C.) 22 Fed. 109, affirmed (C. C.) 24 Fed. 559, it be considered as not free from doubt whether, in

a controversy wholly of foreign origin, and between citizens or subjects of foreign countries, the admiralty courts of this country will in any event entertain jurisdiction to enforce a maritime lien, given by the general maritime law as recognized in this country, in a case where the libelant would not be entitled to such a lien in the place where the contract was made or where the cause of action accrued, the question is of no practical importance, because the Supreme Court in The Maggie Hammond, 9 Wall. 435, 450, 19 L. Ed. 772, while apparently recognizing that the courts of this country may do so, stated that in general they will not. In Re Insurance Co., supra, it was held and argued with great force that our courts should never do so. There are no conceivable circumstances in this case which would justify a court of this country in conferring upon the libelant a right which it did not possess either by the law of the ship's flag or the lex loci. Of course, the situation would be different if it did not appear what the respective foreign laws are. Under such circumstances, in a case such as this, our own law would be applied. Liverpool Steam Co. v. Phenix Insurance Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788; Cuba R. R. Co. v. Crosby, 222 U. S. 473, 32 Sup. Ct. 132, 56 L. Ed. 274, 38 L. R. A. (N. S.) 40.

[2] The laws of Great Britain and of Germany have both been pleaded, and, if no lien or right to proceed against the vessel is given under either of them, it is immaterial whether or not the libelant is entitled to proceed in rem, under the general maritime law as recognized in this country. In the first place, on behalf of the claimant, it is urged or suggested that in a case like the present it is the law of the ship's flag which should govern. The only authority cited is The Woodland, 14 Blatchf. 499, Fed. Cas. No. 17,977. The decision of the Circuit Court in that case was affirmed by the Supreme Court (The Woodland, 104 U. S. 180, 26 L. Ed. 705), but upon an entirely different ground; no reference being made to that upon which the decision in the court below was rested. The question was carefully examined, and the authorities collected and discussed, in a very elaborate opinion rendered by Judge Brown, in the same district a few years later, in The Scotia (D. C.) 35 Fed. 907. The conclusion was there reached that the question as to whether a lien, independent of express contract, exists for supplies or necessaries furnished to a foreign vessel, depends on the law of the place where the supplies or necessaries were furnished, and not on the law of the country to which the vessel belongs. The utter unsoundness of a rule such as the claimant suggests is there shown, and the case of The Woodland explained and distinguished.

It would be quite unnecessary for me to attempt to add anything to what Judge Brown so well and clearly stated. It would seem proper to observe, however, as pointed out by Judge Brown, that the question in the Woodland Case was whether the master of the vessel could expressly create a lien on the vessel in a foreign port, other than by a bottomry bond, when the law of the ship's flag did not permit him to do so, and not whether the ship would be subject to a lien for supplies, when the lien was created by the law of the place where the

supplies were furnished, independent of express contract. There is manifestly a broad distinction between these questions, for one depends upon the scope of the master's authority and the other solely on the law of the place of the transaction. It is also worthy of note that the case of Lloyd v. Guibert, 6 B. & S. 100 (s. c., L. R. 1 Q. B. 115), which is cited as the authority for the remarks in The Woodland, which are relied upon by the claimant in this case, was discussed by the Supreme Court in Liverpool Steam Co. v. Phenix Insurance Co., supra, and it was there shown that, under the peculiar circumstances of that case, it was held that the parties must have intended to look to the law of the ship's flag as governing the question of liability. The case is therefore not an authority for the broad statement contained in the opinion in The Woodland. Hence, as the law of Germany has no bearing on this case, it is immaterial whether or not it gives a lien upon or right to proceed against this vessel.

[3] But the claimant further contends that under the English law the libelant is not entitled to a maritime lien in a case such as this, but only to a right to arrest the vessel on the institution of an action. This position is undoubtedly correct (The Heinrich Bjorn, 11 App. Cas. 270, 24 Eng. Rul. Cas. 608; The John G. Stevens, 170 U. S. 117, 18 Sup. Ct. 544, 42 L. Ed. 969; see, also, the English authorities collected in The Scotia [D. C.] supra, 35 Fed. 908), and, in fact, is not disputed by the libelant. The right in England to arrest or proceed in rem against a foreign ship for necessaries supplied is settled by the courts of that country to have been conferred by section 6 of Act 3 & 4 Vict. c. 65. See The Heinrich Bjorn, supra. That statute, in terms, merely conferred upon the Admiralty Court of England jurisdiction to decide claims, among others, for necessaries supplied to any foreign ship, and to enforce the payment thereof. By section 6 of the subsequent Act 24 & 25 Vict. c. 10, there was conferred upon the English Court of Admiralty jurisdiction over certain other controversies. This latter statute was considered by the Supreme Court, in The Maggie Hammond, 9 Wall. 435, 456, 19 L. Ed. 772, to authorize the admiralty courts in this country, in administering the foreign law, to proceed in rem against the vessel, even if it did not confer a maritime lien, but merely a right to sue the ship. These statutes are in pari materia (The Heinrich Bjorn, supra), and if jurisdiction in rem can be maintained in this country under one, it certainly can be under the other.

Under the construction placed upon the word "necessaries," used in the first of the above-mentioned English statutes, by the English Court of Admiralty in The Riga, 3 Adm. & Eccl. 516 (where the English cases on this point are collected and discussed), the items, for the collection of which the libel in this case is filed, clearly come within the statute in question. No questions regarding the right of intervening lienors, or other persons who might have acquired rights, by purchase or otherwise, in the vessel between the time the cause of action arose and this proceeding was instituted, are presented in this case. It follows, therefore, that this court *may* entertain juris-

diction of this proceeding, although it is in rem. This leads to the sustaining of the third exception.

[4] There is then presented the important question, raised by the first and second exceptions, whether, in view of the additional facts alleged in the answer, a court in this country *should* now take jurisdiction.

The answer alleges, in substance, that the litigation is between foreigners, is wholly of foreign origin, and that for some time prior to the filing of the libel a state of war existed and still exists between the governments of the respective litigants, as to which controversy this country has declared its neutrality; that by a decree of the German government of September 30, 1914, its subjects are forbidden from making any payments to British subjects; and that the claimant had sufficient funds in Great Britain at the outbreak of the war to meet any claim which the libelant had on account of the matters alleged in the libel, which funds were confiscated by the British government after the outbreak of the war. In addition to the German decree it appears that the British government, on September 9, 1914, promulgated a similar decree, and Parliament shortly after passed a statute, known as the Trading with the Enemy Act (St. 4 & 5 Geo. V, c. 87).

It is urged that in view of these facts the courts of this country should decline to entertain jurisdiction at this time, and that consequently the libel should be dismissed. Whether our admiralty courts will take jurisdiction of controversies between foreigners which have not arisen in this country is unquestionably discretionary, and, when they do, it is, of course, upon principles of comity. The Maggie Hammond, supra; The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152; Taylor v. Carryl, 20 How. 583, 611, 15 L. Ed. 1028. However, the almost unbroken practice has been to entertain jurisdiction, except in those classes of cases which are mentioned in The Belgenland, 114 U. S. 363, 5 Sup. Ct. 860, 29 L. Ed. 152, and in those of a kindred nature, such as Goldman v. Furness (D. C.) 101 Fed. 467. This case does not fall within any of such classes. Although the status of commercial dealings and obligations between parties whose countries are at war is well defined in English and American jurisprudence, as respects the courts of the belligerent nations, strange as it may seem, their treatment in the courts of neutrals has not been the subject of any reported decisions, until very recently. The question has been considered, as far as I am aware, in but two cases—the first decided by Judge Veeder, of the Eastern district of New York, sitting in admiralty, in Watts, Watts & Co. v. Unione Austriaca di Navigazione, 224 Fed. 188; and the second by Vice Chancellor Stevens, of the Court of Chancery of New Jersey, in Compagnie U. de T., etc., v. United States Service Corporation et al., 95 Atl. 187. The judgment in the former has just been affirmed by the Circuit Court of Appeals of the Second Circuit. 229 Fed. 136, —— C. C. A. ——. In addition, some support for the conclusion reached by Judge Veeder may be found in certain of the remarks of Judge Van Ness in Juando v. Taylor, Fed. Cas. No. 7558.

Although the conclusions reached in the two cases first referred to can be distinguished on principle, because the New Jersey case dealt with a contract to convey land located in the state of New Jersey, although made abroad, and the federal case with a maritime contract made and to be performed in another country, yet the distinguished jurists who decided them expressed quite radically different views as to the propriety of our courts entertaining jurisdiction. Their respective views, as expressed in their opinions, fairly represent the contentions of the parties to this controversy. In the case decided by Judge Veeder the controversy was between a subject of Great Britain and a subject of Austria-Hungary. The latter country had promulgated a decree similar to that of Great Britain before mentioned. Judge Veeder, as I understand his opinion, while denying any extraterritorial efficacy to these decrees, held that they were merely declaratory of the common law of nations, as the same had been judicially declared in this country and England, and hence, such "being the law common to the belligerents and to the neutral forum," it should be recognized and applied in the latter, and that a failure to do so would not be consonant with the strict neutrality which this country has assumed in the present unhappy controversy. His summary of international law, as recognized and applied by the courts of England and this country, is abundantly supported by the authorities. On the other hand, Vice Chancellor Stevens was of the opinion that to refuse to take jurisdiction of a cause of action, arising out of a contract entered into before the beginning of hostilities, would be an unneutral act, because it would be, in effect, recognizing the legislation of one country, enacted as a means of crippling its enemy, to the detriment of a citizen of the other country. His view was, as I gather it, that neutrality requires us to impartially extend the right to sue in our courts to every belligerent alien who has a bona fide cause of action against another, which our courts are capable of redressing, and which we would have entertained, had not the state of war existed.

As to which is the correct view, opinions may justly differ. The difficulty with the latter view, I think, is that it fails to recognize that a refusal to entertain jurisdiction is not based upon the legislative enactments or decrees of the belligerent nations, but upon what we consider to be the common law of nations, of which the enactment and decrees are but declaratory. As it is the recognized right of a nation, while at war, to forbid performance, by its citizens, of contracts entered into before the beginning of hostilities with citizens of the country with which it is at war, when performance would aid the enemy, would it be compatible with neutrality to refuse to recognize and respect the existence of such a right, when both have invoked it? I think not. Additional force has been given to the view entertained by Judge Veeder through the affirmance of his decision by the Circuit Court of Appeals of the Second Circuit. While it is true that the latter court stated that it was a matter within discretion of the former as to whether to take or decline jurisdiction, and, as no abuse of discretion appeared, the decree would be affirmed, still it is in-

conceivable that in respect to a matter of so great importance, if the learned judges of the Court of Appeals had entertained any serious doubt regarding the correctness of Judge Veeder's judgment, they would not have reversed it.

The present case cannot be differentiated in principle from the Watts Case. It is true that that was a suit in personam, and this is a suit in rem. But, whatever distinction may in general exist between such suits, there can be no reasonable basis for distinction when the question is whether a neutral court shall take cognizance of a controversy which has arisen between citizens or subjects of belligerents. I therefore think that the facts alleged in the answer, to which the first and second exceptions were taken, would warrant this court in declining to entertain jurisdiction of this suit at this time. Nor can I see any good reason why the whole matter should not now be disposed of. International law is something of which courts will take notice, and the decrees and proclamations, which, as before stated, are declaratory of it, have, by the stipulation of counsel, in effect been made established facts. There is nothing left to try.

The first and second exceptions will therefore be overruled, and the libel dismissed without prejudice.